Our next case is case number 418-0502, David Cooke v. Illinois State Board of Elections. For the appellant, we have Mr. Schwab. And for the appellee, we have Mr. Dozman and Mr. Jacob. And Mr. Dozman will be arguing first. You may proceed, Mr. Schwab. Thank you, Your Honor. May I please report? The undisputed evidence presented to the Board of Elections clearly shows that the Committee for Frank G. Montiel violated Section 9-B.10-A-2 and A-9 of the Illinois Election Code in three ways. First, the Committee violated Section A-9 by making expenditures for gas and repairs at Happy Super Service Station for vehicles that did not own the lease. Second, the Committee violated Section A-2 by making expenditures for gas and repairs at Happy Super Service Station for personal vehicles in excess of the fair market value of what it received in return, which was the gas and repairs that were used only for campaign and... How's that different from A-9? Both involve new vehicle, right? That's correct. Both involve the same set of facts. Right. A-9 is a statute that limits how the Committee can spend money on vehicles. And so it provides that if there's a vehicle not owned or leased that's used for campaign or governmental purposes, there's a specific way that the Committee must spend money on that. And that is through mileage basis. And not repairs. And not repairs, correct. And the Committee did not. So under that theory, it violated A-9. A-2 is clearly in excess of fair market value. And the way that the Committee was making expenditures for gas and repairs at Happy's resulted in the Committee paying more than it would have paid if it was just paying for gas and repairs for campaign or governmental use. Because inevitably, what happened was those gas and those repairs were used for personal use because they were personal vehicles. And it would be difficult, if not impossible, to separate out a tank of gas and only use that for campaign or governmental purposes. And for repairs, it's impossible. You can't get a car repaired and then only drive it for campaign or governmental purposes if it's your personal vehicle. Presumably you're using it for personal purposes. So that's why it violates Section A-2. Well, that's a difficult concept for me to grasp. Wouldn't there be another section that would apply to that? Because that section seems to me to say that if gas is selling for $3 a gallon, you can't pay $5 a gallon in order to benefit the merchant. And that's not what you're saying here. Let me give you a hypothetical. Supposed they buy a tank of gas, charge it to the committee, then the candidate goes shopping, takes the kids to school, does two or three other things, clearly uses the first half of that tank for personal business or personal stuff. And the second half legitimately drives to a campaign event, wherever, and comes back. In that case, it would seem pretty clear to me that there's been an abuse in the sense that the committee has paid for something that the candidate used himself or herself, personal items. Are you saying that this Section A-2 is where that type of conduct would fall in the code, and that's the way that person in the campaign would be charged? Yeah, I think that A-2 does cover that. Is there any other section, I guess I'm asking you, that covers that? Because that is a really strange way to assert such a violation, in my view. I don't know if there's other sections, but let me answer your question about why it's strange with another hypothetical that I think is similar to what's happening here. Suppose the committee purchased gas, and it purchased the monetary equivalent of five gallons of gas. And so it used the five gallons of gas, but it actually paid for ten gallons of gas. That's what's happening here, in the sense that they paid for gas and repairs that were supposed to be used for campaign and governmental purposes. So they paid for that money. That's the five gallons. Why did they do that? I don't know why they did it. But I know that inevitably it's going to result in a benefit to the people that own those vehicles. It also resulted in a benefit to Abbey's Super Service Station, because Abbey's received the gas and repairs, the business, from all these people. If the committee had followed the code and was just reimbursing for the mileage basis, then presumably all of the persons that received money for using their vehicle would have probably gone to other gas companies. Okay, I guess the inference is that this committee wanted to bestow a benefit on Abbey's. Is that what you're saying here? I think that I'm not saying whether or not what the intention was. I don't know what the intention was, but the intention is not an element of what I have to prove. But the result was that it did give a benefit both to the individuals who drove their vehicles and to the Abbey's Super Service Station. And that's exactly why the Section A-2 should apply in this circumstance, because it gave benefits in excess of what the committee was actually paying in return. All right, that is still hard for me to follow, because I don't know why a committee would want to pay more for something than the fair market value unless they're trying to benefit, in this case, Happy's because they own part of Happy's or a relative of the candidate owns part of Happy's. But you're saying that's not an aspect of this at all. I'm saying it's not an aspect I have to prove, but I think the reason that these sections of the code exist is to prohibit that kind of behavior. Similarly, when we have restrictions on campaign contributions, the Supreme Court says you can put restrictions so long as they are related to prevent corruption or the appearance of corruption. So the appearance of corruption in this case, it could be corrupt, it might not be, but it appears corrupt and it could be corrupt. And that's why this section exists, to prevent that appearance of corruption or the appearance of corruption. Okay, you said earlier that the conduct pertaining to the vehicle or vehicles under A9 and A2 involved were the same. The conduct was the same, I should say. Correct. So assuming I agreed with you, would there be one fine imposed if there was a knowing violation, or would there still be two? There could be two. The important thing for us is not the fine or the amount, it's the recognition that this was a violation of the code. This is an important case because obviously the Board of Elections is not enforcing this or doesn't appear to be enforcing this section. It appears that in order to enforce it, a citizen has to come forward, which is obviously expensive and very difficult. And so you have a section of code that is apparently not being enforced and not being applied correctly under the Board of Elections. So it's very important that other candidates and committees know what the rules are when it comes to what they can do in terms of expenditures. So that's why this case is important to us. That's why my client David Cook filed it. And it's not really about the fine. And, in fact, I'm not even sure, given that Mr. Montino is Auditor General and no longer in the elected office, that he would – that the committee – I think the committee just essentially dissolved, so I'm not sure that they would actually pay the fine. So the fine is not the important aspect to us in this case. But I do think that A2 and A9 for the same conduct are separate violations. Now, there has been a fine issue in the past for a reporting violation, right? Correct. Could you refresh my recollection on what that was? Sure. Because I want to make sure it doesn't pertain to the three claims you're making here. So it does involve the third aspect of the claim, but it doesn't involve – it involves the same conduct, but it's different. And that is the third claim that we have, which is a violation of Section A2 for expenditures purportedly made to the bank. And so what was actually happening at the bank – what appears to be happening from the reporting was that the bank – or that the committee was making expenditures to the bank in certain amounts for things like travel expenses, campaign workers, things like that. Of course, the bank does not provide those services. So the committee was misreporting those things. And under the testimony of the treasurer, what was actually happening was that they were writing checks to the bank to cash, taking the cash, and then using that cash to spend on expenditures later, which they reported as whatever they were, travel expenses. But we don't know who the third-party vendors were that received that money. And obviously, that's a huge problem because – there's a reporting breakdown there. Is that why the committee was fined? And if so, why – that's already been addressed, it would appear to me. It has been addressed. The issue that we have now under A2, which is, again, the same provision about clearly in excess of fair market value, was that under the testimony that we heard from Patricia Manu, the treasurer, what was happening for these – especially for these travel and meeting expenses was that they would write a check for, say, $200. Then they would cash the check. Then Frank Fontina would go to his meeting or travels and, say, $200 for travel expenses. And then he would never return any unused cash. And, of course, it's unlikely, if not impossible, that every single time he did this, that it was exactly an increment of $100. So what we know for a fact is, or what we can infer from that, is that he was spending less money than what he was actually taking out. So if he was spending, let's say, $195, then he was reporting and they were actually spending $5. We don't know where that money went. I understand what you're saying there. Again, though, that seems like a real stretch to me to say that A2 applies to that conduct, which states that a political committee shall not make expenditures clearly in excess of the fair market value. It would just seem to me there's got to be another section under the code that would cover a candidate's personal use of political contributions. There may be, but I think A2 does, in fact, cover that conduct because the requirement is that it has to be clearly in excess of the value of the goods and services received in exchange. The goods and services received in exchange were clearly not $300 every single time. So we know that what they were actually spending, $300, $200, whatever, was not actually what they were getting in return. But would it be correct that some of that is also a problem of reporting in that you give your treasurer back receipts that shows you the hotel bill was $112, the mileage was this, and the food was this? If that were done, then it would be transparent or apparent how much might have been retained for personal use. That's correct, but there could still be a separate violation of A2, even if the reporting was correct. So suppose that they did, in fact, get saved receipts, came back, and there were three receipts from three different vendors. They reported the total added up to $176, and they took out $200. That's still paying more money than they actually received in return. That might be accounted for or taken into consideration regarding the fine. I know it's separate, but that's a lot different than taking out $500 and spending $100. Right. Because you're not really... I'm not suggesting that it's okay, but you're not really enriching yourself if on one of your trips you end up with $18 extra. Maybe, but we know that this was a persistent act. Agreed. In 2014 and 2015, the last two years in the quarterly reports, there were 13 examples of meetings and travel expenses, and they were all in whole dollar amounts. So we can infer that at least some, if not all, of those actual spending was less than what they took out. And so over time, you're continually enriching yourself. And, of course, that activity, even if you're not really doing anything, even if it's not that amount of money, the perception of that is very bad, and that's why A2 exists. Especially in Illinois, we don't want our officials to appear corrupt. And I'm not saying that Frank Montino did anything corrupt. This could have been an honest mistake, but the code is what it is. And so we don't have to prove that he was corrupt, but we don't want this activity to continue in the future because we don't want people... Obviously, we don't want the corruption, but we also don't want people to lose faith in their elected leaders because it appears that they're doing something for them. I'm going to move back to Section A9 about the purchase of gas and repairs. So Section A9 provides a limited number of ways in which a committee can make expenditure for motor vehicles. There's four basic rules. One, it can lease a vehicle that's used primarily for campaign or governmental purposes. Second, it can purchase a vehicle used primarily for campaign or governmental purposes, so long as it can prove that doing so is actually more cost-effective than leasing. And it can also ensure, maintain, or repair a leased or owned vehicle used primarily for campaign purposes or for the performance of governmental duties. And it can make other expenditures for the lease and purchase vehicles, so long as those expenditures are used solely for campaign or governmental purposes. And finally, and this is the section that is relevant here, it can reimburse persons who use a vehicle not leased or owned by the committee for actual mileage used for campaign purposes or for the performance of governmental duties at a rate not to exceed the standard mileage rate of the internal revenue bill. There's no dispute that the committee did not loan or lease any vehicles. We have testimony from the treasurer. We have the reports. None of them show anything spending on leasing or purchasing or leasing a vehicle. And nonetheless, we have testimony from the treasurer that what the committee did was it had a charge account at Happy Super Service Station and it paid for gas of Frank Martino's associates, including his family, including the treasurer, the treasurer and various campaign workers, and for his four personal vehicles that they prepared and paid for gas. So there's a clear violation. We have testimony, we have evidence that what they did was not consistent with what Section 89 requires. And there's no dispute over any of these facts. All of this is undisputed. It's testimony from the treasurer herself. But the committee and the board don't think that there's a violation because they assert that Section 9-8.10c gives them, allows them to pay for gas and repairs for personal vehicles. Now, Section 10c provides that nothing in Section, sorry, is this the five-minute warning? Yes, it is. Nothing in Section 10, sorry, Section 10c, nothing in this section prohibits the expenditures of funds for a political committee controlled by an office holder or by a candidate to defray the customary and reasonable expenses of an office holder in connection with the performance of governmental and public service functions. But nothing in Section 89 actually does prohibit that kind of spending. In fact, it explicitly says that expenditures can be used for governmental purposes. You just have to follow the other requirements of 89. Section 10c can't be read to make obsolete Section 10a. Obviously, we have statutory rules of construction, and in general you can't read out a more specific statute, language and statute, by another provision of the statute more broadly. And we can consistently read these two. The Section 10c just allows, makes sure that these candidate committees can make spending for governmental purposes. Section 10a provides more limited restrictions on how it can do that, but it still allows for that kind of spending. So there's no basis to say that 10c provides an out for the committee. And further, 10c only applies to governmental spending, not campaign funds. And it's virtually certain that in addition to paying for personal funds, that over a 16-year period and over $125,000, I think maybe it was more than that, that some of the money went to campaign funds. So if that's true, then 10c can't totally absolve the committee either. So Cook has shown that there's a viability. Counsel, you are out of time. And you'll have additional time on rebuttal if you desire. Mr. Dozman? It pleases the Court. I'm Assistant Attorney General Aaron Dozman, and I represent the Illinois State Board of Elections and its members. The four board members who found no violation of 9-8.10, that decision was not clearly erroneous. Clearly, an erroneous standard is deferential and it only allows reversal where a mistake is made. A mistake cannot be shown on this record because the complaint, the entire case is built on disclosure reports that have been found to violate the code to be deficient, to not contain sufficient evidence to establish other violations. Cook then had discovery, and he did take deposition of the committee's secretary, but produced no extra evidence to fill in that evidentiary gap to establish the violations of 8-2 and 8-9. And to find a violation either way requires either drawing an inference or not drawing an inference. And to draw the inference or not draw the inference cannot be a mistake in this case because one conclusion isn't mandated by the evidence. So for the four who decided to decline to draw the inference, to fill in that evidentiary gap to where the evidence was lacking, that cannot be said to be a mistake on their part. As it relates to the 8-2 violation, the theory of liability seems to swallow every other violation under Cook's theory because they're just taking any expenditure that is prohibited and saying, well, it didn't go to the committee, so therefore nothing of value was received by the committee, and so they have paid more than the fair market value of not receiving anything, which is obviously nothing. There's no fair market value calculus to that interpretation of 8-2. It just becomes a redundant section to all other violations. It would necessarily follow that every other prohibited expenditure becomes an 8-2 violation if that's the case, and that's just not accurate. And that's true for both Hatties and the bank. For the facts surrounding the vehicles, there are a few facts to clean up. First of all, the treasurer testified that every expenditure that was made to the Hatties committee account was for campaign work. There were two accounts at Hatties. There was a personal one, and there was a campaign one. There's no evidence to suggest that campaign workers or family members were charging for personal use of the vehicle on that account. And I think the problem in that violation is the method in which the committee decided to reimburse people for mileage. They said it was through campaign work. Well, this is what we can surmise from the record. Nothing is conclusive about this arrangement. But what the four board members who declined to fund the violation suspected was that someone did work for the campaign, and they, say, used a quarter tank. They wouldn't charge a quarter tank on the account. First, I'm drawing inferences to say that there are folks also making inferences to explain how this works, and that's why we're at a deadlock in this case. What's the deadlock about mileage? I mean, the statute is pretty specific. You can reimburse based on mileage at a rate not exceeding the IRS rate. Okay, just forget for a moment if somebody accrued an extra benefit from it. Failing to provide or to ask for reimbursement based on mileage is a violation. And further, it provides no transparency to anybody that's interested in political campaigns and how they're conducted and how dollars contributed are used. You're absolutely right on the second point, that that's a disclosure violation. That's been found. That's been found. Excuse me, what's a disclosure violation? The way in which they reported the descriptions of the expenditures, yes. That was the first version of the prior proceedings. The board said, these expenditure reports, disclosure reports, violate 9-7 and 9-11. They found that. They said, amend the reports. If you don't, you can go to a public hearing to determine whether someone was fined. They imposed a maximum fine, $5,000. And that's where it is right now. There's an outstanding fine. And the committee has been dissolved, as I understand it. Reimbursing for mileage, there's no way to – I think the problem is the way that they set up reimbursement for gas was by using a charge account. And there's no way to know, did you, you know, fill up more than you spent or spent the gas doing the campaign work. We do know that everyone charged on the account is authorized to do so and only did so for campaign work. But we don't have the mileage breakdown, the gallons breakdown, I don't think. I think it's on a monthly basis. Some of them are in the aggregate. So we couldn't parse through and say, okay, you were paid too much. You were reimbursed too much in this month with campaign work you did. You obviously then used campaign-bought gas for your personal trip to San Luis Obispo. There's nothing to show that. And so we don't know how to assess a fine, which expenditures we can point to. Well, wouldn't that justify the argument that that is a violation of A2 as opposing counsel has presented to this court? No, because I can't look at it and say either way what's personal use, what gas went towards personal driving and what went towards campaign driving. How about repairs? And on the repairs, we know that only Frank Mattino's cars were repaired at Abbey's. And I think the theory was that those might fall under subsection C, which is about customary and usable expenses. And nobody put on evidence showing what's a customary and usable expense and what's not. But opposing counsel says that repairs aren't even allowed on a non-campaign leased or owned vehicle, right? I don't read that in A9. I don't think that's in A9. And this maybe goes to a fundamental difference in how we read the code, how it regulates expenditures. And expenditures are something that campaigns are generally free to spend how they think is best to get the candidate elected. Do you understand that all three of us have run for office? I do, yes. So we have some understanding of reporting and how campaign dollars are supposed to be used. I believe there's a wide variety in how the campaigns are run. Some keep really meticulous books. Others are on the loose or shot loose. What the board was presented in this case, they said it was deficient, and they found violations on that. Highly non-law violations required inferences, speculation, and the four board members who chose not to do that that cannot be said to be at stake on this board. How long has the board been in existence, and how long has it had eight members? I don't know the answer to that. I'd like to find the genius that gave it eight members. Well, it does model the FEC, which is also a partisan party. That is hardly a benchmark. Yeah, well, it makes sense given the political nature of their subject matter. I think it recognizes that there are some built-in biases with the oversight of politics. And so this is the way it's designed, and it favors inaction when you have a situation like this. And it contemplates that. Couldn't the inaction or the sanction be taken care of by the amount of the fine so that they use their individual ideas and discretion to say, yeah, this was clearly a violation, but it didn't line anybody's pockets to any great extent. And because the filings were deficient, it doesn't provide sufficient transparency, so we're going to fine this campaign this amount. Whereas one that is the amounts are clearly excessive, and there's no justification for it, then you hit them with a big fine. Sort of a victory without consequences. Well, I don't know who it's a victory for. If I was a candidate, I wouldn't want to be found and violated the code. We have everyone agree there are disability violations. Taking it further as far as the inferences on violations, yes, they could exercise discretion in the fine, but there wouldn't be a violation first. That's what we're asking. Thank you, counsel. Mr. Jacob. Good morning, Your Honors. May it please the Court, my name is Anthony Jacob. I'm here to represent the committee to thank my team. Thank you for the opportunity to address you. We should start with the understanding that the election code provides for a definition of expenditures. It's fairly broad. In 9-1.5, the definition of expenditure is any payment, distribution, purchase, loan, advance, deposit, gift of money, or anything of value made to support or oppose a candidate for proposition. So you start from the understanding that the definition of expenditure is pretty broad. You then jump over to 9-8.10, which is titled Use of Political Money in Reporting Organization Funds. And then 8 says a political committee shall not make expenditures. And that starts to identify those things that it cannot use its funds to make certain expenditures. The committee did not own or lease a vehicle. So with respect to A9, there's no argument that we did own or lease a vehicle. When you look at A9, A9 talks about use of persons' vehicles for campaign purposes and for governmental duties. It's the appellant's burden to show that the funds were used for personal purposes. And the appellant hasn't done that. The appellant wants you to make assumptions and isn't it likely that the funds were used for personal purposes because look at how much money there is and look how much travel there is. The committee, through the testimony of Ms. Monson, who is the treasurer, who, by the way, was high school education, she worked with the committee. These are local people who don't have a high degree of accounting knowledge who try to do the right thing to disclose expenditures. And that's what she did. She disclosed expenditures. She didn't try to deceive anybody. She took the information that was provided. She would occasionally, and the record shows this, contact the State Board of Elections and say, am I doing this right? Is there something that I'm not doing right? And they responded at times either by phone or letter to advisers what she should or shouldn't be doing. This is a person who's been reporting campaign reports for about over 10 years. I would say even a little bit more. I don't know her exact time period. But it's been a very long period of time. So it was the appellant's burden to show that the money was not being used for campaign or political purposes. It was being used for personal purposes. And we're looking at a preponderance of the evidence standard, right? Yes, at that level. And the board decided to forward the report. After the board decided to forward the report, they went to each board member and said, why is it that you're finding this way? Why is it that you're finding this way? And there was not any evidence in the record to support it. One of the board members referred to the evidence as being an amorphous lie, that it wasn't put together. There wasn't information about the use of the vehicle for personal purposes. They're making the assumption that that's the case. If it's reported properly, doesn't that mean? The reporting of it in a proper way from an accounting perspective or a political perspective, because this is a political committee, obviates the need for this evidence. Isn't the failure to properly document it raise the presumption that it was used improperly, thereby requiring the committee to show, yes, you're right, we committed this violation, but we have this evidence to show that either all or 99% of it was spent exactly as would have been spent had we documented it properly. Otherwise, is the committee being allowed to benefit from failure to comply? Your Honors, we have, I think, a fairly unique situation here. First of all, we have a person who's no longer a candidate, who's no longer able to hold office anymore, dissolved this committee, and then, as you would if you closed your office, started to dispose of files and documents over a number of years and retained what he thought was important at the time. Should he have retained more documents? Possibly did he retain the right documents? I'm not entirely certain, but there was a violation found for inadequate reports. That is different from what Your Honors is addressing, and I understand that. But there could have been an amendment to the reports if there was proper information retained by the committee, if individuals are still authorized to act on behalf of the committee to file reports. There wasn't a burden shift in here with that regard because it still remains the accountants' burden to show that there was a violation. In fact, if you look at 9-8.10b, it actually states here that the board may only levy a fine against the person who knowingly makes an expenditure in violation of the statute. So Ms. Martino, with the experience she had, thought she was doing it right. Okay, then you'd impose a lesser fine or no fine at all, but there's still a violation. I mean, isn't that one way to look at it? I would disagree, Your Honor, and that's because when you look at the election code, it allows for the use of campaign-based, broad category expenditures unless they were for personal purposes. You have another section... The only way that you can assure that they're not used for personal purposes is to do proper reporting. Or maybe not the only... That is a way which is required by the statute. Your Honor, I agree that is the way, but there's also a requirement to retain records. And that's why I say this was a unique situation in that there could have been records that would have clearly allowed for this, but they didn't exist because of the unique nature of the person constitutionally not able to hold office, and in most cases elected to the Auditor General's position and then closed the state well before there was any question of dispute in this case. If you look at 9-8.10.6, which hasn't been raised, but this is an example of a section that says for... It starts by saying a political committee shall not make expenditures for the travel expenses of any person unless the travel is necessary for fulfillment of political, governmental, or public duties, activities, or purposes. There are a number of exceptions in this section, a number of 8.10 in A-6, in C, that go to a point that the broad definition of expenditures intended to allow the committee to use the money to elect a candidate. And these are just... What we have here in B-10 are very specific limitations. If you want to own a vehicle, you have to do it a certain way because, you know, you can abuse that. If you want to reimburse somebody, if I want to pay somebody to reimburse somebody money because they used it, there's always a certain way to do that. What we're doing here is Ms. Martino and the committee put together a system to monitor the use. They identified separate accounts for the committee and separate accounts for personal use. They kept records. They would bill on a monthly basis. They kept receipts showing who was using, who still lived with us, how many p.ms., what was the rate. To get to Your Honor's point about rate, in our brief we talk about some of the legislative history behind 9-8.10b-2. And it really talks about, like, the rate, like a clear fair market value rate. And it doesn't look to the totality. It looks to see whether or not an expenditure was made and whether it clearly was in excess of a rate that is market value. All of the gas was paid for and evidence was produced to a pound to show receipts and invoices and everything being paid at market rates. We identified, maybe improperly so in our report, but we identified money from a bank that was going to pay for campaign workers, for hours worked, for travel expenses, for meals. I don't want you to assume that any extra money that was left over went into a kid in his pocket. I'll tell you that Mr. Montino was one of the most highly, wonderful character, integrity person I've ever met. It's more likely that he hadn't put money out of his pocket because he didn't have enough. And this isn't a trick question. Wouldn't that be a reporting violation? Wouldn't that be a contribution that should have been accounted for? If he paid money out of his own pocket, it might be, but he could use his funds to defray the cost of governmental or... So that wouldn't be that significant, but the point is... Well, I'm not talking about whether it would be significant. I'm talking about this being a morass of... You're talking about the evidence is an amorphous blob. The whole thing is so problematic that I don't know how anybody can discern how to run a campaign. And campaigns are run differently. We know that, and the accounting is done differently. We know that from personal experience, and probably from your experience and other candidates' experiences. But I'm trying to understand why... What do we do to a defendant in a civil case who disposes of the records that are absolutely necessary to either put on a defense or answer questions by the plaintiff? I mean, there's missing evidence, and you've done away with it. I'm not suggesting that that was purposeful, but what is the continuing obligation of the committee to retain records, the records that you've said, it's a problem because everything got dissolved? Is there a continuing obligation in the statute? None. What's the case in dissolved? Should there be? You know, it really depends on the situation. Well, it doesn't also depend on the political climate. Right now, aren't we hypersensitive to this, or shouldn't we be? I think it's important to retain records when... You mean dissolved by the plaintiff at the moment? Yes. When the committee dissolved, it retained records that it thought was important. It was tough to second-guess, you know, looking back and second-guessing what would it or wouldn't it. But they did retain a number of records, and they were all produced in this case. Thank you, counsel. Thank you. Any rebuttal? I just wanted to address the claim that there is no evidence in this case, or not enough evidence in this case, to approve the appellant's claim. First, with respect to A-9, the evidence is clear. A-9 requires that a committee pay for gas, or if it doesn't own or lease a vehicle, it pays for the travel used, the car vehicles used, via mileage. They didn't do that. There's no dispute. There's no requirement in that sense. How about counsel's argument that that A-6 allows them to do what they did? Well, the subsection 6, anyway. Well, they've never argued that in any of the briefs. And so I think this is the first time they've brought it up. But I don't think that A-6 reads out a requirement in A-2. And it would make that sense of A-2 redundant. The fact that both the board and the committee's arguments seem to be that you're allowed to spend expenditures on travel or whatever, however you want. And so apparently the last sentence of A-9 should read, or it can do it however you want. But why put that sentence in there? It makes no sense if you're going to say there are other ways that you can make these expenditures. So it really makes no sense. With respect to A-2 and the violations of A-2, the enforcement committee said there wasn't enough evidence because the records were distorted. But anybody who looks at the record, at the evidence, knows that what happened was that, for example, with the spending of gas and repairs, is that inevitably the gas and repairs were used for personal use. You don't have to guess that. It's inevitable. There's no way that you can pay for repairs that are going to be used exclusively for campaign or governmental purposes for your personal vehicle. At some point, that repair is going to be necessary for you to drive your car for personal purposes. Same with gas. You might say, okay, how much gas did you use? But inevitably, over time, there's going to be many times where you're running an errand or doing something personally on that gas that is used for personal purposes. There's no way to control that. And so we know. We don't have to guess. We know that, inevitably, that money went to some personal purposes. Similarly, with the testimony that we have from Patricia Manu, we know that the committee, that Frank Latino, wrote these checks for X amount of dollars and didn't return the money. So we know that, inevitably, there's no way to know. I've never had multiple times where I've had a travel expense that has been a multiple of $100, let alone 13 times. So we know some of that money did not go for personal purposes. Let me ask a question. Nobody has used the phrase or the words double jeopardy, but floating through this is the idea that the committee's already been sanctioned for bad reporting. Well, many actions that you can take regarding criminal law, you can take many actions, and that can be multiple violations of the criminal code. So if I drive a car dangerously, I could simultaneously do damage to property and kill somebody, and that would be multiple violations of the criminal code for the same conduct. So similarly, I think the same conduct, and that is paying money for gas and repairs of people can be multiple violations of the code. The failure to report it? I don't think that the failure to report is actually the conduct that resolved it in the violations that we're talking about here. What was the conduct? Well, for Abbey's, it was the underlying conduct of paying for personal, for gas and repairs. That has nothing to do with the reporting. And then, as I mentioned before, that it's perfectly logical to assume that you could be properly reporting the reports to the bank as travel expenses, but still he could be taking more out than he was actually spending. So I don't think that the reporting was actually the conduct that was the result of what we're talking about here. I also just want to point out that if what was required of a plaintiff, in this case, would be to show all of this evidence without, you know, that we have to have all these papers and show specifically these were used for personal purposes, that's a great recipe to never actually be able to enforce the code. And if I can just finish my point. You may. And to anybody who wants to violate the code by actually being corrupt, you know that the reporting violation has a max of $5,000. So why not destroy all the evidence that you have about spending in violation of these sanctions, spend it on whoever you want in violation of the code, and your max penalty will be $5,000 for the reporting violation. Thank you, counsel. We'll take this matter under advisement and be at recess until the next case. Thank you.